# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| Kim Bankhead, | : | Case No. 1:08CV2484 |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Magistrate Judge David S. Perelman |
| | : | |
| Village of Newburgh Heights, et al., | : | **MEMORANDUM OPINION** |
| | : | **AND ORDER** |
| Defendants | : | |

This action is before this Court upon the separate motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure of the defendant Village of Newburgh Heights ("the Village"), and the consolidated motion of defendants Hoover, Szelenyi, and Minek.

Plaintiff Kim Bankhead's claims arose consequent to her November 25, 2007 arrest for operating a vehicle while under the influence, after which she claims to have been seriously beaten and injured by police officers.

Plaintiff initiated this civil rights action under 42 U.S.C. §1983 against the Village, Patrolman Bob Hoover, Patrolman Joseph Szelenyi, and Auxiliary Officer Chris Minek, in their individual and official capacities, alleging that the individual police officers "intentionally and deliberately used excessive and unreasonable force intended to cause serious physical harm and severe emotional distress to" the plaintiff, which actions constituted "deliberate and intentional violations of 42 U.S.C. §1983 and the clearly established rights of Plaintiff, Kim Bankhead, as

1

guaranteed by the Fourth and Fourteenth Amendments to the Constitution of the United States." As regards the Village, the plaintiff asserts a claim based upon the alleged failure to properly train its police officers, as well as a failure "to promulgate policies, plans and procedures designed to protect the civil rights of the persons who come in contact with its police officers," and that the individual police officers "acted pursuant to official policies, plans and training of their respective agencies when they repeatedly" caused harm to plaintiff, which in turn violated her clearly established constitutional rights in violation of 42 U.S.C. §1983.

In plaintiff's fifth through eleventh counts she alleges state law claims of conspiracy to violate her constitutional rights, assault and battery, false arrest and false imprisonment, and negligent and/or intentional infliction of emotional distress, and malicious prosecution.

On November 25, 2007, the plaintiff, after making a right turn from a stop sign on East 42nd Street onto Washington Park Boulevard, was pulled over by Patrolman Hoover for failure to yield to oncoming traffic.[1]

In his deposition, Officer Hoover (who at that time was approximately 6' tall and weighed 202 pounds) stated that the plaintiff (who at that time was approximately 5'6" tall and weighed 130 pounds) nearly struck his vehicle while making her right turn, and did not immediately stop when he activated his overhead lights, causing him to call for assistance.  Patrolman Szelenyi arrived on the scene and blocked her vehicle from moving.

The police report on the incident indicates that the officers did not feel it was safe to perform field sobriety tests upon the plaintiff, causing them to decide to take her in to the station. Patrolman Hoover, however, stated upon deposition that he attempted to perform an HGN test

---

[1]The factual recitations set out herein are primarily derived from the depositions of the plaintiff and the individual officers, whether or not specifically so stated herein.

upon the plaintiff prior to taking her in to the station.  The police report also indicated that the plaintiff smelled of alcohol and had to be assisted by him after she exited her vehicle, so that she would not fall, whereas during his deposition he stated that he did not assist her while she walked but that she used her car for support.  Patrolman Szelenyi testified when deposed that the plaintiff did not need assistance and that she walked to his vehicle unassisted.

The plaintiff testified upon deposition that while she was being placed under arrest, Patrolman Hoover spun her around and slammed her head upon her vehicle with such force that a piercing was knocked out of her lower lip, after which she remembers being tasered several times but does not remember much more.  Patrolman Hoover denies that he spun the plaintiff or that he slammed her head on the vehicle.

The parties agree that Patrolman Hoover double-locked the handcuffs behind the plaintiff's back, and escorted her to Patrolman Szelenyi's vehicle.  Both Patrolman Hoover and Patrolman Szelenyi concede that the plaintiff was tasered by Patrolman Szelenyi after the handcuffs were placed on her wrists.  In his police report, Patrolman Hoover described the taserings as follows:

> Once we reached the rear of 51-01 (Patrolman Szelenyi's vehicle) I advised Kim to sit in the rear seat and Kim refused.  I again advised Kim and she began to pull away from me.  Myself and Patrolman Szelenyi plead with Kim to cooperate and sit in the rear seat or she would be tased.  Kim stated "go ahead I'm not getting in there!"  Patrolman Szelenyi pulled out his taser and showed and removed the cartridge from the top and turned it on.  Patrolman Szelenyi stated "please sit in the car I don't want to tase you."  Kim again refused and Patrolman Szelenyi activated his taser and pulled the trigger in demonstration of its ability and asked Kim to be seated.  Kim refused and began to pull away from me again and Patrolman Szelenyi performed a "drive stun" technique. Kim began to crouch down at which time I was able to get her upper torso in the rear seat.  Kim's legs were still outside of the police cruiser and she was attempting to exit the police cruiser so I advised her to put her feet inside the rear compartment and she again refused.  I

3

> advised her that Patrolman Szelenyi will tase her again if she does
> not comply.  Kim again refused to comply and stated "fuck you I'm
> not going anywhere."  Patrolman Szelenyi performed another "drive
> stun" technique and due to Kim's article of clothing, Patrolman
> Szelenyi was not able to have a good enough impact to neutralize
> Kim and she stared at him.  I advised Patrolman Szelenyi that I
> would reach in from the passenger side rear door and assist Kim by
> sliding her completely into the rear seat.  When I reach in a[nd]
> grabbed Kim by the right arm, she began yelling as I pulled the rest
> of her body in the rear seat.  Once Kim was completely in the rear
> seat, Patrolman Szelenyi shut the door.

Differing accounts of the tasering of plaintiff while she was handcuffed behind her back can be found in Patrolman Hoover's police report, where he stated that plaintiff refused to get into the vehicle and was pulling away from him; in Patrolman Hoover's deposition testimony in which he stated that plaintiff was pulling away from the officers and that she began to kick Patrolman Szelenyi; and in Patrolman Szelenyi's deposition testimony in which he stated that plaintiff did not strike anyone or attempt to strike anyone prior to the first time he activated his taser, and that he did not fear for his safety.

After she had been tasered the first time, plaintiff was seated in the cruiser with her feet extending out of the vehicle, at which point she was kicking Patrolman Szelenyi, according to his testimony.  The use of force reports completed by both officers, however, make no mention of any kicking by plaintiff, despite there being a box in which an officer can indicate whether any such activity occurred.  Patrolman Hoover's police report is similarly devoid of any mention of kicking at that point.

The dispatch tape for the traffic stop does not indicate anything unusual or that the plaintiff was tasered.  In fact, it was not until plaintiff had been taken to the station and tasered several more times that the dispatcher on duty at that time, Ms. Holly James, entered a note on the dispatch log

at the end of her shift which read in pertinent part:

> Female Kim D. Bankhead was tasered a total of six times.  Two of the tases happened on the traffic stop which happened before I came in and changed shifts with the other Dispatcher Minek.  Four of the times, she was tased on my shift. (See 51-09's report to see why Kim was tased).  Dispatcher Holly James, myself, did hear the tases, but didn't see them.

After the plaintiff was placed into Patrolman Szelenyi's police cruiser, he drove her to the station and once there, she was handcuffed and shackled to the "prisoner bench."  Initially she was handcuffed to the bench only by the left wrist, but after she tried grabbing a phone, Patrolman Hoover grabbed her and secured both wrists to the bench.  A short time later, though, plaintiff was able to slip out of the right handcuff because her wrists were small, and when Patrolman Hoover grabbed her right arm and tried to resecure her, while her left hand was still secured to the bench, he found it necessary to request assistance because the plaintiff was grabbing his uniform and wrist, whereupon Auxiliary Officer Minek[2] came to his assistance.

Once Auxiliary Officer Minek arrived he and Patrolman Hoover each managed to use their tasers[3] on the plaintiff two times, while she was handcuffed by her left wrist to the prisoner bench.  There are differing accounts of the timing of the taserings, with Patrolman Hoover and Auxiliary Officer Minek stating in their depositions that they tasered plaintiff within minutes of each other, while the taser logs indicate that the taserings occurred approximately twenty minutes apart, with

---

[2]Questions were raised by the plaintiff as to the job status of Auxiliary Officer Minek.  Detective John Morgan of the Cuyahoga County Sheriff's Department, an investigator as to various matters on this case, testified upon deposition that although this person was referred to as an auxiliary officer, he had officially been sworn in as a dispatcher, with no evidence of having been sworn in as an auxiliary officer.  Nevertheless, the investigation also revealed that Newburgh Heights Police Chief Cvarovsky permitted Auxiliary Officer Minek to carry and use a taser and to perform other duties of law enforcement officers, including patrolling the village with a shotgun in his patrol car, transporting prisoners, and responding to calls along with other law enforcement officers.

[3]Patrolman Szelenyi gave his taser to Auxiliary Officer Minek upon leaving the station to transport Mr. Michael Bankhead to the North Royalton jail.

5

Auxiliary Officer Minek tasering her at 23:27:27 hours, and Patrolman Hoover doing so at 23:43:17 and 23:43:28 hours.  Officer Landberg's testimony corroborates the taser logs, as he stated that in between taserings the officers escorted the plaintiff to the bathroom.

The plaintiff testified upon deposition that she recalled being tasered multiple times while she was handcuffed to the prisoner bench.  She also recalled screaming for Mr. Bankhead, having "extreme pain" in her left leg which caused her to slap at her leg as though she was "putting out a fire," and hearing Patrolman Hoover say to her as he knelt beside her that he "wanted to tase [her] again so bad that his dick was hard."  In support of her claims that she was burned by the repeated taserings, plaintiff has offered photographic evidence.

During the nearly 2 1/2 hours that the plaintiff was held at the Newburgh Heights police station no sobriety tests were performed on her and there was no BAC machine on site. Detective Morgan learned during his investigation that Patrolman Peterson had been summoned three times to the station to transport the plaintiff to the Bedford jail, but that each time he was told that she was not ready for transport.

Officer Landberg testified upon deposition that he saw the plaintiff lying motionless on the prisoner bench after the repeated taserings, at which point he instructed the dispatcher to call the fire department.  Slightly more than a week after the incident involving the plaintiff, Officer Landberg was interviewed by Detective Morgan during which he provided a written statement in question and answer format in which he stated that prior to calling the fire department, he observed that plaintiff was "slouched over like she was dead," "totally out this time," "hanging between the floor and chair suspended by the cuff."  He noticed that her eyes fluttered and that "she began to silent cry like she could not get air."  At this point, it was Officer Landberg's observation that the

plaintiff no longer tried to remove her hand from the cuff and he saw the other officers un-cuff her so that she could use the bathroom.  Officer Landberg stated that he noticed the other officers were "smiling and smirking and pulling the taser out and going back at it[,]" and expressed his concern that if "something is not done about the current trend of taser incidents/officer behavior" it was possible that somebody could "get killed."  He further offered his opinion that it was odd that "three grown officers" would need to use that degree of force to subdue a small woman, and added that he believed their actions constituted "excessive force, plus some."

In early 2009, Officer Landberg was terminated from the Newburgh Heights Police Department for neglect of duty, failure of good behavior and conduct unbecoming an officer, consequent to his having provided information to the Cuyahoga County Sheriff's Department which his employer believed to have been misleading allegedly "in an attempt to damage by offering information to discredit the Village and co-workers."  Officer Landberg filed a grievance and an arbitrator ultimately ordered him to be reinstated, with back pay, ruling that his termination was without just cause.

Plaintiff has offered expert testimony of retired Police Chief Melvin L. Tucker, formerly of the Tallahassee Police Department, who opined that the repeated use of the taser on the plaintiff while she was handcuffed behind her back and shackled to the prisoner bench constituted excessive force, and the authorization of "Dispatcher Christopher Minek to go through Taser certification training and to carry a Taser when he was not a sworn or certified police officer," as well as the failure to properly train the officers or to provide policy guidance as to "when, against whom, and how many times it was appropriate to use a taser against a person [each] demonstrated a reckless disregard for the safety of the persons coming in contact with officers of the Newburgh Heights

Police Department carrying Tasers and was causally connected to the injuries sustained by Kim Bankhead."  Detective Morgan also offered his opinion that the use of the taser on the plaintiff constituted excessive force.

The Newburgh Heights Police Use of Taser Policy in effect at that time describes the use of a taser as "more than a show of force and less than a use of 'less-lethal' force in the use of force continuum."  There is no description as to the guidelines for use of the taser beyond the following:

1)  Officers using taser will be using techniques learned in training

2)  Necessity of usage in the field will be officers [sic] discretion depending on situation

3)  Usage will be documented in report form and designated on a taser use of force form.

The Village argues that with respect to training, it complied with the training given to all Ohio peace officers through the Ohio Peace Officer Training Academy (OPOTA), as is reflected in the report of its expert,  Samuel D. Faulkner.  Mr. Faulkner opined that the use of the taser upon the plaintiff under the circumstances of this case "complied with the training given to all Ohio Peace Officers" and "was the best decision based on the propensity to establish control in relation to the relative risk of injury both to Ms. Bankhead and the officers."

The plaintiff claims both physical and psychological injuries, including post-traumatic stress disorder and attempted suicide, for which she has been medicated.

The plaintiff was charged with resisting arrest, OVI, and disorderly conduct.  Upon entry of her plea of no contest to the OVI charge, the remaining charges were dismissed.

The individual defendants argue that they are entitled to summary judgment on the counts against them for each of the following reasons: (1) there was probable cause to stop and arrest the

8

plaintiff; (2) the plaintiff's no contest plea is a complete bar to claims for malicious prosecution and false imprisonment; (3) the officers used objectively reasonable force; (4) there was no violation of the plaintiff's due process rights; (5) the individual defendants are entitled to qualified immunity; (6) there is no evidence of a civil conspiracy; and (7) the plaintiff's state law claims are subject to dismissal.

In opposing summary judgment, the plaintiff argues that there is at least a genuine issue of material fact indicating that the use of force against her was unreasonable.  She also argues that as a matter of law, the defendants are not entitled to qualified immunity on either the federal or state law claims against them.

The disposition of a motion for summary judgment is governed by Rule 56(c) of the Federal Rules of Civil Procedure, which provides for the granting of such motion only where, "[T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to  judgment as a matter of law."  It is the court's function under such a motion to determine whether a genuine issue of material fact exists, as opposed to endeavoring to resolve any such factual issues.  Tee-Pak, Inc. v. St. Regis Paper Co., 491 F.2d 1193 (6th Cir. 1974); 6 Moore's Federal Practice 56.15 [1.-0].   It is the initial burden of the moving party to demonstrate the absence of a genuine issue of material fact as to an essential element of the claims brought by the non-moving party.  Curto v. Harper Woods, 954 F.2d 1237, 1241 (6th Cir. 1992);  Wilson v. Zanesville, 954 F.2d 349, 350-351 (6th Cir. 1992);  Street v. J.C. Bradford & Co., 886 F.2d 1472 (6th Cir. 1989).

In Street v. J.C. Bradford & Co., supra, the Sixth Circuit Court of Appeals reviewed three

9

then recent decisions of the United States Supreme Court addressing summary judgment practice, Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Celotex Corp. v. Catrett, 477 U.S. 317 (1986); and Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).[4]  The court summarized those cases as standing for a number of new principles in summary judgment practice, including the fact that cases involving considerations of state of mind issues (such as discriminatory action) are not automatically inappropriate for summary judgment; that a federal directed verdict standard ("whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law") should be applied to summary judgment motions; that a non-moving party must provide "more than a mere scintilla of evidence" to avoid summary judgment; that the substantive law applicable to the cause of action will govern the materiality of the issues of fact; that the court has no duty to search the record to determine the existence of genuine issues of material fact; and perhaps most significant, that a trial court has more discretion than it would have in the past in weighing the evidence offered by the non-moving party, considered in light of the whole record, to determine whether that party's evidence does "more than simply show that there is some metaphysical doubt as to the material facts" or whether it demonstrates that the non-moving party's claims are "implausible".  Id. at 1479-1480 (Footnotes and citations omitted.)

Under 42 U.S.C. § 1983 a civil action may be brought in federal court by one deprived of federal constitutional or statutory rights by state officials:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be

---

[4]After the passage of a number of years the court's reference to those rulings as representing a "new era" of "dramatic change" may no longer hold true, but the characterization of their import as to motions for summary judgment being viewed with "more favorable regard" certainly remains true.

> subjected, any citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights, privileges, or
> immunities secured by the Constitution. . . shall be liable.

As is clear from the facts set out herein, the § 1983 claims against the individual officers in the present case arise from their alleged use of excessive force in violation of the plaintiff's Fourth Amendment rights.

A defendant against whom such an action has been brought may raise the affirmative defense of qualified immunity in order to "shield[ ] 'government officials performing discretionary functions...from liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known.'" Gardenhire v. Schubert, 205 F.3d 303, 310-311 (6th Cir. 2000) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

A qualified immunity determination turns in part on whether "taken in the light most favorable to the party asserting the injury...the facts alleged show the officer's conduct violated a constitutional right[.]" Saucier v. Katz, 533 U.S. 194, 201 (2001).[5]  Absent such a violation, the case should be dismissed.  St. John v. Hickey, 411 F.3d 762, 768 (6th Cir. 2005), citing Saucier v. Katz, supra at 201.

Once such a violation is demonstrated, the next step is to determine whether the right was clearly established at the time of the incident in question such that it would be clear to a reasonable officer that the actions directed against the plaintiff were unlawful given the circumstances with which the officer was faced.  Saucier v. Katz, supra at 202.

In cases such as this, where the plaintiff asserts that the officers violated the Fourth

---

[5]The test announced in the Saucier case has been upheld by the United States Supreme Court in Brosseau v. Haugen, 543 U.S. 194 (2004).

Amendment "right of the people to be secure in their persons..against unreasonable searches and seizures" by reason of their alleged use of excessive force to effectuate the arrest, the question turns on the reasonableness of the actions taken by the arresting officers.  The inquiry as to the officers' reasonableness is an objective one, so that the officers' actions must have been "'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  St. John v. Hickey, supra at 771, citing Graham v. Connor, 490 U.S. 386, 397 (1989).  Accord,  Brosseau v. Haugen, supra at 388.  Factors which impact that assessment include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Saucier v. Katz, supra at 205, citing Graham at 396.  Those factors are not meant to be exhaustive, rather:

> [T]he ultimate question is "whether the totality of the circumstances justifies a particular sort of seizure."  *Id.*  Resolving this question in a particular case inherently requires the court to carefully balance the nature of the intrusion on the arrestee's *Fourth Amendment* rights against "the countervailing governmental interests at stake." [Tennessee v.] *Garner*, *471 U.S.* [1] *at 8.*  Finally, as this Court has observed, "this standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case."  *Burchett* [v. Kiefer]*, 310 F.3d* [937] *at 944.*

St. John v. Hickey, supra at 771.

Applying the foregoing to the present case, this Court must first consider whether "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  Lyons v. Xenia, 417 F.3d 565, 576 (6th Cir. 2005), citing Saucier v. Katz, supra at 201; Feathers v. Aey, 319 F.3d 8433, 848 (6th Cir. 2003).  Stated differently, this Court must determine whether a reasonable officer faced with these same

12

circumstances would have known that the actions taken by the agents were objectively unreasonable. Id. at 576, citing Scott v. Clay County, 205 F.3d 867, 877 (6th Cir. 2000).

Considering the facts of the present case in the light most favorable to the plaintiff, there is at least a question of fact as to whether a constitutional violation occurred. The plaintiff alleges that the individual officers used excessive force during her arrest in violation of the Fourth and Fourteenth Amendments, by using taser devises on her more times than was safe, despite the fact that she was much smaller and weighed less than the multiple male officers who interacted with her while she was handcuffed to the bench and not posing a threat to anyone. The officers have a completely different view of the case, claiming that she did pose a threat to them and was unruly to the point of not being under control. The right to be free from excessive force in the context of an arrest or seizure is a clearly established right with which a reasonable police officer would be familiar. Lyons v. Xenia, supra at 575, citing Graham v. Connor, supra at 394-95.

The Sixth Circuit Court of Appeals has held that the use of force on a suspect who had been placed in restraints is unconstitutional, McDowell v. Rogers, 863 F.3d 1302, 1307 (6th Cir. 1988); and that the use of pepper spray on a handcuffed suspect who was no longer threatening the officers' safety constitutes excessive force, Champion v. Outlook Nashville, Inc., 380 F.3d 893, 901 (6th Cir. 2004), cert. denied, 544 U.S. 975 (2005). More specifically, the Sixth Circuit found the use of a taser on a subdued suspect amounted to excessive force, holding that "[t]he gratuitous use of force on a suspect who has already been subdued and placed in handcuffs is unconstitutional." Roberts v. Stricklen, 240 Fed.Appx. 675, 677 (6th Cir. 2007), quoting Bultema v. Benzie County, 146 F.Appx. 28, 35 (6th Cir. 2005).

While the defendants rely on cases holding that handcuffed suspects could be tasered if

they physically resisted or posed a danger to themselves or others, those cases may be distinguishable from the instant case, depending on which version of the facts the jury accepts. For example, in Goebel v. Taser Int'l, Inc., Case No. 5:07CV0027, 2007 U.S.Dist.LEXIS 68560 (N.D.Ohio 2007) (J. Economus), the court referred to the plaintiff as even "more hostile, belligerent, and uncooperative than the plaintiffs" in other cases which held that tasering while handcuffed was not unconstitutional, in light of the fact that the plaintiff in that case was hiding in cramped space in a basement, and, even though the officers identified themselves, he refused to come out, claimed he had a gun, continuously threatened to kill the officers, throw things at them, projectile vomit on them, and was covered with blood, and continued much of the foregoing even after they had tasered him.

Clearly which version of the facts is accepted determines where a situation should be placed on the continuum of cases, some of which hold that the tasering of physically restrained suspects is unconstitutional, and some of which hold that it would not be unconstitutional.

The same holds true of the qualified immunity defense.  The determination as to whether a defendant is entitled to qualified immunity may be determined upon summary judgment, except where "the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury." Adams v. Metiva, 31 F.3d 375, 387 (6th Cir. 1994).  Accord, Gill v. Kovach, Case No. 4:08CV1839, 2010 U.S.Dist. LEXIS 75470 (N.D.Ohio July 27, 2010) (J. Nugent)(In that case, the plaintiff was described by the court as "non-compliant, resisting arrest, attempting to flee, and acting in an erratic and violent manner; there were bystanders in close proximity; and, an increasingly menacing situation was developing in the bar's parking lot," but the court found that there was at least a genuine issue of material fact as to whether the level of force used by the

14

officer could have been deemed as excessive. )  As was the case in <u>Gill v. Kovach</u>, if a jury finds that the individual officers' view of the fact is correct, and therefore, that there has been no constitutional violation, then qualified immunity would shield them from liability for the plaintiff's injuries, whereas if the jury accepts the plaintiff's view of the facts as true and finds that the officers used excessive force on her, then the officers will not be entitled to qualified immunity and may be found liable for her injuries.[6]

There being genuine issues of material fact as to whether a constitutional violation occurred and whether the individual officers are entitled to qualified immunity, the individual defendants would not be entitled to summary judgment on plaintiff's §1983 claims against them.

The individual officers also assert that there is no evidence of a civil conspiracy to violate the plaintiff's §1983 civil rights.

A civil conspiracy has been defined as:

> "[A] combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties 'to inflict a wrong against or injury upon another,' and 'an overt act that results in damage.'" In order to prove the existence of a civil conspiracy, *a plaintiff is not required to provide direct evidence of the agreement between the conspirators; "circumstantial evidence may provide adequate proof of conspiracy."*  Absent the testimony of a co-conspirator, it is unlikely that direct evidence of a conspiratorial agreement will exist.  Thus, the question whether an agreement exists should *not* be taken from the jury in a civil conspiracy case *so long as there is a possibility that a jury can "infer from the circumstances [that the alleged conspirators] had a 'meeting of the minds' and thus reached an understanding' to achieve the conspiracy's objectives.*  (citations omitted) (emphasis added).

_____

[6]The same would be true of plaintiff's claims of conspiracy to violate her constitutional rights under §1983.

15

Coon v. Froehlich, 573 F.Supp. 918, 922 (S.D.Ohio 1983).

While express agreement among the alleged co-conspirators is not an essential element, Hooks v. Hooks, 771 F.2d 935, 944 (6th Cir. 1985), there must be sufficient factual support of a meeting of the minds to deprive plaintiff of her rights in order to survive summary judgment.  This Court cannot any factual support for such a meeting of the minds of the individual officers.  As a consequence, summary judgment is granted to the individual officers on plaintiff's claim of conspiracy to violate her §1983 rights.

The Village has also moved for summary judgment, claiming that the plaintiff's claim under 42 U.S.C. §1983 fails as a matter of law, as there is no "proof of a viable constitutional violation," and because plaintiff cannot prove that an official custom or policy of the village caused a constitutional violation.  The Village also argues that it is immune with respect to the plaintiff's state law claims.

The plaintiff asserts that there is at least a genuine issue of material fact that the Village in general failed to adequately train its officers or to implement proper procedures for the use of a taser, which in turn constitutes a reckless indifference to the safety of persons coming in contact with the police officers with tasers.  The plaintiff further maintains that there is at least a genuine issue of material fact as to the Village's reckless indifference pertaining to the carrying and use of a taser by defendant Minek, who was not a sworn police officer at the time of the incident upon which this case is based.

In light of the fact that the doctrine of respondeat superior does not apply to §1983 claims, in order to establish municipal liability arising out of the actions of a municipal officer a plaintiff must demonstrate more than merely that the municipality employed the officer.  Monell v.

16

Department of Social Services of the City of New York, 436 U.S. 658 (1977).  Rather, the conduct of the officer must be attributable to some deliberate practice on the part of the municipality which establishes the existence of a policy, de facto or explicit, of authorizing the constitutionally prohibited conduct.  Board of County Commissioners of Bryan County, Okl. v. Brown, 520 U.S. 397 (1997).  Accord, Turner v. City of Taylor, 412 F.3d 629, 643 (6th Cir. 2005); Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999).

Two elements must be addressed in determining municipal liability, being: (1) whether plaintiff's injuries were caused by a constitutional violation, and, if there was such a violation, (2) whether the municipality is responsible for the violation.  Collins v. City of Harker Heights, 503 U.S. 115, 120 (1992).  Accord, Cash v. Hamilton County Dept. of Adult Prob., 388 F.3d 539, 542 (6th Cir. 2004); Napier v. Madison County, 238 F.3d 739, 743 (6th Cir. 2001).  A direct causal link must be established between municipal policy or custom and the alleged violation of constitutional rights.  Board of County Commissioners of Bryan County, Okl. v. Brown, supra at 404.

§1983 municipal liability may be based upon the inadequacy of police training, if it can be shown that such failure to train amounted to deliberate indifference to the rights of persons with whom the police come into contact.  City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989); Fisher v. Harden, 398 F.3d 837, 849 (6th Cir. 2005); and Shamaeizadeh v. Cunigan, 338 F.3d 535, 557 (6th Cir. 2003).

> In sum, to succeed on this claim a plaintiff must prove that "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis v. Cleveland Mun. Sch. Dist., 455 F.3d 690, 700 (6th Cir. 2006).*

Gill v. Kovach, supra at *31-32.

17

In the instant case there is deposition testimony that in 2007, when the tasering of plaintiff occurred, the Village had no department policy on the number of times a person could be tasered by individual officers.  The Village's 2007 "Use of Taser Policy," quoted infra, describes the use of a taser as "more than a show of force and less than a use of 'less-lethal' force in the use of force continuum," and the only guidance provided as to when the taser was to have been administered by an officer was that it should be used within each "officers [sic] discretion depending on situation" and whenever "hands on" was appropriate.

The lengthy, detailed, experts' (both plaintiff's and defendants') review of the Village policy on tasering, on the training provided regarding the use of force, and on the failure to properly train, as well as their opinions on the use of Dispatcher Minek, and the deposition testimony of various witnesses, create genuine issues of material fact on the issue of municipal liability on the §1983 claims.  Consequently, the Village's motion for summary judgment on plaintiff's §1983 claims is unpersuasive.

Turning to the state law claims raised by the plaintiffs, the individual officers argue that plaintiff's claims of malicious prosecution and false arrest or false imprisonment cannot succeed in light of the fact that she plead no contest to the charges against her.

In the <u>Gill</u> case, the law pertaining to false arrest and false imprisonment was summarized as follows:

> "False imprisonment consists of confining one intentionally without lawful privilege and against his consent within a limited area for any appreciable time." *Feliciano v. Kreiger, 50 Ohio St.2d 69, 362 N.E.2d 646 (1977).*  In their essential elements, false imprisonment and false arrest are indistinguishable in that "each claim requires proof that one was intentionally confined within a limited area, for any appreciable time, against his will and without lawful justification." *Strickland v. Twoer City Mgmt. Corp., No. 71839,*

18

> *1997 Ohio App. LEXIS 5802, 1997 WL 793133, at \*4 (Ohio App.Ct.
> Dec. 24, 1997)*, citing *Ashcroft, 68 Ohio App.2d at 364*. "[T]o
> succeed on a claim of false arrest or imprisonment, a plaintiff must
> establish that the defendants were without legal authority to arrest
> and detain him and that the detention was not accomplished
> pursuant to accepted legal procedures." *McFinley v. Bethesda Oak
> Hosp., 79 Ohio App.3d 613, 616, 607 N.E.2d 936 (1992).*
>
> *Ohio Revised Code § 2935.03(A)(1)* states that an officer has the
> authority to arrest and detain individuals "found violating" the laws
> of the state, or municipal ordinances, until a warrant can be
> obtained.  The language "found violating" has been interpreted to
> authorize warrantless arrests for misdemeanors "only where the
> offense has been committed in the officer's presence."  *State v.
> Mathews, 46 Ohio St.2d 72, 75-76, 346 N.E.2d 151 (1976).*

Gill v. Kovach, supra at \*44-46.

It has been held that "When a §1983 claim is predicated on an allegation of false arrest,

false imprisonment, or malicious prosecution, such claim must fail if probable cause for arrest

exists."  Scott v. City of Bexley, 11 Fed. App'x 514, 516 (6th Cir. May 24, 2001) (quoting Hansel

v. Bisard, 30 F.Supp.2d 981, 985-86 (E.D.Mich. 1998)).

In the present case, there is no question that there was lawful reason to arrest the plaintiff.

Accordingly, these claims for relief for malicious prosecution, false arrest and false imprisonment

are unfounded and subject to dismissal upon summary judgment.

As for the balance of the plaintiff's claims under state law, the defendants argue that they

are entitled to immunity from liability under Ohio law pursuant to Ohio's Political Subdivision

Tort Liability Act, Section 2744 of the Ohio Revised Code, which provides that employees of a

political subdivision are immune from liability provided that they are carrying out a "governmental

function" and unless "the employee's acts or omissions were with malicious purpose, in bad faith,

or in a wanton or reckless manner."  Ohio Revised Code §2744.03(A)(6)(b).

19

"Malice" has been defined as "the willful and intentional design to do injury or the intention or desire to harm another, usually seriously, through conduct which is unlawful or unjustified." *Cook v. City of Cincinnati, 103 Ohio App.3d 80, 90-91, 658 N.E.2d 814 (Ohio Ct.App. 1995) citing Jackson v. Butler Cty. Bd. Of Comm'rs., 76 Ohio App.3d 448, 602 N.E.2d 363 (Ohio Ct. App. 1991).* "Bad faith," on the other hand, is defined as "a dishonest purpose, conscious wrongdoing, the breach of a known duty through some ulterior motive or ill will, as in the nature of fraud, or an actual intent to mislead or deceive another." *Id.* "Wanton misconduct" is characterized by "the failure to exercise any care whatsoever." *Cook, 103 Ohio App.3d at 90-91 citing Fabrey v. McDonald Police Dept., 70 Ohio St.3d 351, 356, 639 N.E.2d 31, 35 (Ohio 1994)* ("mere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity on the part of the tortfeasor."); *Hawkins v. Ivy, 50 Ohio St.2d 114, 363 N.E.2d 367 (Ohio 1977).* "Reckless conduct" occurs when a person "does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent." *Thompson v. McNeill, 53 Ohio St.3d 102, 104-105, 559 N.E.2d 705 (Ohio 1990).*

Davis v. East Cleveland, Case No. 1:03CV2075, 2006 U.S.Dist.LEXIS 11913, *44-46 (N.D.Ohio 2006) (M.J. Vecchiarelli).

Each of the reasons articulated previously herein to establish that there are genuine issues of material fact as to the use of excessive force and, in turn, whether the individual officers are entitled to qualified immunity, can be applied to also find genuine issues of material fact on the parallel issue of immunity of employees of a political subdivision under state law. Consequently, summary judgment is denied on these issues as regards the individual officers.

Turning to the issue of statutory immunity of the Village under the Political Subdivision Tort Liability Act, "a political subdivision is immune from liability for the intentional torts committed by its employees, or for any actions of its employees that may injure or cause death

20

when the action is taken in connection with a governmental or proprietary function. OHIO REV. CODE §2744.03(A); §2744.02(A)(1)." <u>Gill v. Kovach</u>, <u>supra</u> at *41.  It follows, that summary judgment on in favor of the Village must be granted with respect to plaintiff's state law claims.

For each of the foregoing reasons, the motion for summary judgment of the individual defendants is hereby granted as to the plaintiff's claims of civil conspiracy, malicious prosecution, false arrest and false imprisonment, and denied as to the balance of the claims against the individual defendants.

The motion for summary of the Village is granted only on the state law claims, and denied as to the balance of the claims against it.

**IT IS SO ORDERED**


                                        s/DAVID S. PERELMAN
                                        United States Magistrate Judge


DATE:   August 27, 2010


21